ELLIS, Judge.
Plaintiff was employed by Farnsworth & Chambers, Inc., as a carpenter and on Nov. 23, 1951 while performing his duties he was struck by the head of a hammer above the left eye. The wound bled freely and he was taken to the first aid station and then immediately to Dr. J. B. Plauche’s Clinic at Morganza, Louisiana, where it was necessary to take several sutures and treat the wound. An x-ray was also made to determine the extent of the injury. He was seen at this clinic on approximately five occasions thereafter, however, he continued tt> work. He was discharged by Dr. Plauche as being cured on December 1, 1951. Plaintiff continued working for the same employee until the latter part of December 1951, when he was discharged in a general lay off. In January of 1952 he, was again rehired by Farnsworth & Chambers, Inc. and worked until February 21, 1952 when he was again discharged in a general lay off.
After this, due to complaints by the plaintiff as to the condition of his eye he was seen by Dr. Courtland Smith, a specialist of Baton Rouge on February 25, 29, March 4 and 11, 1952, and by Dr. Gerald F. Joseph of Baton Rouge, another specialist, on July 8, 1952, and by Dr. Ben Féndler of Alexandria on August 21, 1952, and by. Dr. Noel T. Simmonds, specialist, on April 16, 1952.
On Séptember 26, 1952 plaintiff filed the present suit in which he alleges that as a result of the blow above, the left eye it continues to tear and water without interruption ; that he suffers constantly and that not only is he unable and totally incapacitated to do work of any reasonable character in. keeping with his trade but he can do no work of any description whatever and is, therefore, wholly, totally and= completely disabled and he prayed for a judgment at the rate, of $30 per. week beginning on or about February 15, 1952 and not to exceed 400 weeks, as for total and permanent .disability, and for all medical and-incidental expenses up to the maximum sum.of $1,000.
After trial there was judgment in favor of plaintiff as prayed for from which the defendant has appealed.
The only question in the case is whether the condition of plaintiff’s left eye was due to the injury he' received in the accident of November 23, 1951. It is undisputed thát plaintiff continued to work satisfactorily until February 21, 1952 without the lo'ss of any time other- than the period in' which he was laid off along with other employees, and without any complaint other than “two of three times” within a week after the accident as shown by the testimony of a fellow worker.
Dr. Plauche attended plaintiff immediately after the accident and had an x-ray taken which he testified was negative insofar as any bone structure was concerned, and the only apparent injury was the laceration which healed satisfactorily;
Dr. Courtland P. Smith, witness for defendant, an ear, eye, nose and throat specialist of Baton Rouge, who examined-plaintiff on four different days testified that he gave him a complete eye examination and he found no external nor internal evidence of injury to either eye but of course found the healed scar in his left eye brow. Plaintiff’s vision was 20/40 in *347 the right eye and 20/50 in the left eye and because of this diminished vision, Dr. Smith took visual fields which showed some defect in the optic nerves or the pathways leading to the optic nerves. ■ Since there was no evidence of any injury he had his skull x-rayed for any possible intra-cranial injury by Dr. David S. Malen on March 10, which showed no fracture, depressed or otherwise, and no evidence of injury to the eyes. It was Dr. Smith’s opinion from his examination that no disability which plaintiff claimed to his left eye was suffered as a result of injuries. Dr. Smith could not account for the defect in the optic nerves but could not “see any way possible how it could have resulted from an injury” although “an optic nerve can be injured either by disease or external force.” Immediately after the last quotation Dr. Smith was asked:
“Q. Now, assuming that this man was hit with a hammer in the region of the eye, how can you be positive in view of your answer immediately preceding that that blow did not injure the optic nerve in this instance? A. Because there is no evidence of other changes inside the eye itself.
“Q. No evidence of external force inside the eye. A. Yes. Also we find approximately the same finding on both-eyes involving the optic nerves.
“Q. Did you find evidence of disease as a result of your examination ? A. I found evidence of what I consider disease when I found the visual fields constricted.
“Q. You are prepared to swear that whatever injury there might be could not have resulted from a hammer blow in the region of the left eye? A. No, I am not. But in my external and internal examination of both eyes I found no evidence of injury. The only evidence of injury seen at all was a very small, well healed scar in the region of the left eyebrow.”
Dr. Smith was cross-examined as to the effect of a severed tear duct, however, he stated positively that he found nb tear dtict severed. This doctor also stated that he found no scars or evidence of injury in the region of the tear duct, therefore, any testimony based upon an assumption that a tear duct had been severed was wholly irrelevant and immaterial. Further, on the four occasions Dr. Smith examined plaintiff he had no severe infection- and his eye was essentially normal' except the vision, as above discussed. Dr. Smith found no inflammation or redness of the eye and if there was any conjunctivitis “it was very mild”. ■ Dr. Smith, after making it clear that he found- in both' eyes a 'diseased or defective optic nerve which in his opinion had no connection with the injury for the reasons given by him, was asked the following question:
“Q. Doctor, you tell us in substance that you find an injury but you can’t account for it. A. That’s right.
“Q. Doctor, if I tell you that before 'Bonnette received the blow on November 23rd he had no trouble whatsoever and that thereafter he did have and continues to have trouble, are you prepared to say’that there is no causal connection? 1 A." Yes, sir. There is none.”
Dr. Joseph, witness for plaintiff, examined plaintiff on July 8, 1952 and on this date the ■ “left eye was generally irritated in appearance and red. The eye lid was slightly swollen. The conjunctiva, the thin membrane which covers the eye ball itself, and the inner surface of the lid, were abnormally engorged and there was pus in the conjunctival sac. In addition, there was inflammation and apparent infection of the deep lid glands known as the meibomian glands.” He saw no evidence of severance of a tear duct. On direct examination this doctor was told that Dr. Smith had found an injury to the optic, nerve and was asked ■if that would be a different or an additional injury to the tear-duct “situation” or would there be a connection between the two. He answered that it would be possible for the samé traumatizing blow to cause both injuries at one time, and that the tearing *348 situation'was not considered as the usual symptom of optic nerve disease, whereas it was a symptom of tear duct disease or injury. He further testified that “it is possible under certain circumstances for that to have caused his- condition.”
In Dr. Joseph’s report he made the statement that “The decision as to the connection between the injury and the present disability and disabling pathology is of course a moot one,” and on cross-examination after giving the previously quoted testimony he was asked what he meant by that statement. He stated that he had seen the plaintiff- in July and he had complained of an injury which he had suffered the previous November, and that he had no opportunity to examine him immediately following this injury and therefore had very little to establish in his mind the nature of the injury and under such circumstances it would be very difficult for him “to clearly have stated that the eye condition was the result of the injury or otherwise.” He freely stated that had this plaintiff come to him for examination without telling him - of any accident he would have given for the cause of any disability “an infection, the cause of which was unknown.” He clearly stated that he was not in a position to say that an accident caused his disability. He did state, however, that any contusing blow in the region by any instrument which was not sterile could have introduced the infection and that by virtue of the contusion and resulting lower tissue resistance it would have made it easier for an infection to gain a foothold. This testimony was given in explanation of a statement in his letter to counsel for plaintiff “that I thought- there may be a possibility of establishing a connection between my findings and the injury.” Nowhere did he state that in his opinion -this had happened. Dr. Joseph stated that the condition which he saw at the time of his examination definitely was a simple infection with no evidence of injury at the time, which plaintiff could have gotten whether there had been an injury or not merely by contact with a particular type of germ. He further stated that plaintiff’s condition was not a particular disease of his age group “but it is a common disease” which he was confronted with in his practice all the time where no injury had been involved.
Dr. Joseph stated that there was a possibility that at the time plaintiff received the alleged blow his eye could have gotten a light infection which over a period of time could have gotten worse as the result of lowered tissue resistance, and when asked if that" was not only a possibility but a normal consequence of an unusual contusion, he answered, “I would have to say that this is an unusual consequence because for the most part, following a blow to the eye of such a nature as he seems to have had, a simple conjunctivitis is not an expected complication.”
■Most of Dr. Joseph’s testimony was, as he deemed it, "merely as a conjectural .possibility”. insofar as any definite connection between the accident and the condition of plaintiff’s eye on the date that he saw him as well as on the day of the trial. He frankly testified that he was not in a position to state the precise cause of the condition of plaintiff’s eye. It could have had many different causes, one of which could have been trauma.
Plaintiff testified that he had not been treated nor given any suggested treatment for his eye, however, in Dr. Joseph’s letter to plaintiff’s counsel he stated that he gave him a prescription for some eye drops. In this letter Dr. Joseph stated “the left eye showed a positive culture of staphylococcus aureus and streptococci organisms, which I believe are accounting for the man’s symptomology.” He was not questioned about these germs other than when he said the man had a simple infection.
Dr. Ben Fendler, witness on behalf of plaintiff, on August 21, 1952 examined plaintiff and found him complaining of a constant tearing and burning of his left eye associated with intermittent pain. An examination at that time showed a vision of 20-/20 in each eye, whereas on December 1, 1952, the date his testimony was given,, or within one week prior thereto, he found *349 the vision in plaintiff’s left eye to be 20/80 and right eye-20/40.
The testimony of Dr. Fendler is the strongest of all- in favor of plaintiff. He thought at first that plaintiff was malingering or putting something in his eye that might cause the constant tearing or there was a definite injury to the nerve supplying the tearing or the tear gland to that eye. In the last, week of November he had the plaintiff, hospitalized and under constant observation for 48 hours and he decided that he was not a malingerer, and on December 1st, he re-examined plaintiff which resulted in the following findings:
“ * * * A chronic irritation or conjunctivitis of the left eye, the tear ducts were patent or open. He showed marked constriction of visual fields, more só in the left eye which I did not take visual fields on the first' examination. A vision of twenty over forty in the right eye and twenty' over eighty in the left eye and the old scar was examined in relation to a possible injury of the lacrimal gland which is located just below the point of injury. Do you want me to give my opinion here? It was my opinion, then, that it is entirely possible that the fifth and seventh cranial nerves which supply the lacrimal gland could certainly have been damáged from the blow and which could have caused and which could be causing the constant tearing, resulting in the chronic conjunctivitis.”'
It was the opinion of this doctor that if plaintiff was subjected to wind and weather his condition would be more aggravated, in other words, that he is disabled as a result of his condition.
With regard to his testimony quoted above touching upon the fifth and seventh cranial nerves he explained it by -stating: “ * . * * when I say fifth and seventh I’m not speaking of the actual nucleus of the nerve but the branches of the.fifth and seventh cranial nerves.” It was his opinion that plaintiff should have shown, some - initial symptoms from -the blow-in: the-way of tearing. There is no testimony of any -such initial symptoms during the time he worked and up until Dr. Smith examined him the latter part of February and first part of March. In fact, Dr. Smith did not mention any tearing. Dr. Fendler stated that plaintiff’s chronic conjunctivitis or the chronic irritation would of necessity have become worse as time goes on because of the tearing into the eye which would cause more irritation. He stated that he felt the constant tearing and chronic conjunctivitis was possibly due to the blow but he could not explain the decreased vision nor the constriction of the visual fields, due to some disconnected trouble of the optic nerves in both eyes. Dr. Fendler stated:
“Q. Would it be your opinion that that tearing would have been constant from the time of injury or at least from the time it. fully manifested itself up until the present'time? A. I would say that there certainly should be tearing within a few days or a few weeks of the injury and it is possible that it could have started immediately following the injury.
“Q. Isn’t it also possible that commensurate with this man’s age that there is absolutely no relationship at all between the tearing and the injury that he related to you that it could have been purely coincidental ? A. I would say no to that, Mr. Gravel, because he is not tearing in the other eye.
“Q. Well, I mean wouldn’t it be possible entirely for one of the lacrimal ducts to be affected? A. The lacrimal ducts are not affected, it is the lacrimal gland that is affected and the gland is located immediately below the point of injury here.
“Q. The point I’m getting at have you ever seen this tearing in other persons who do not relate any history of injury at all? A. We find it more in people without injuries than' we do with injuries.
“Q. That- is why I 'say, Doctor, in this case .isn’t it entirely possible that the tearing even though it is only in *350 one eye, could be such as would not have resulted from trauma? A. I would say that it was possible, yes.
“Q. I mean there is no real way, Doctor, for you to say ás a positive fact' that this tearing that Mr. Bonnette. has is a result of a blow that he received nine months before you examined him ? A. That is correct, with this reservation that in view of my examination and finding no other reasons, I would be forced to conclude that it was possibly or probably due to the blow, but it is possible that it could be due to something else.”
.In view of the fact that no tearing of plaintiff’s left eye was found by Dr. Smith approximately three months after the accident with no inflammation or redness of the eye, applying Dr. FendleFs testimony to the effect that if the injury had caused the condition in plaintiff’s left eye it should have been constant from the time of the injury or at least from the time it fully manifested itself up until the present time, and certainly within a few days or few weeks of the injury, his diagnosis must fall to the effect that the blow injured the branches of the fifth and seventh cranial nerves which affected the lacrimal glands.
Giving full effect t.o the medical testimony heretofore discussed it appears that it clearly preponderates, in favor of the proposition that plaintiff’s condition was not due to or connected with the blow received on Nov. 23, 1951 but was a simple infection common to many people without1 any blow or injury.
It might be well to add that Dr. Fendler , testified that any defective vision which the plaintiff had was not caused, in his opinion, by any trauma.
Dr. Simmonds examined the plaintiff on April 16, 1952 and testified as follows:
“A. Well, the first thing in any eye examination is a test of the visual acuity, his vision incorrect in the right eye was 20/30 and in the left eye was 20/40. He was refracted, that is tested for glasses and with a weak glass his vision was corrected to 20/20 in each eye. He stated that he had difficulty in reading his ruler which he blamed on that injury but the trouble there is that he. was forty nine (49) years old. With a reading glass appropriate for a person his age he was able to read fine print. The examination of the eye itself was as follows: The right eye was found to have a small pterygium which is of no consequence, he also had a small posterior subcapsular cataract in the right eye which was not causing him any visual impairment and was not in any way associated with the injury. The right eye was otherwise normal which included examination of the interior of the eye with an ophthalmo-scope as well as the anterior segment of the eye with what is commonly called a ‘slit lamp.’ The left eye. He has two small scars,in the left eyebrow one of them just above the inner corner of the eye and the other one just inside and above the outer corner of the eye. .The direction of the scars being in a. generally vertical direction and they are approximately a quarter of an inch to three-eighths of an inch long. These scars are freely movable, not being in any way attached to the periosteum to the bone, in other words, .you can slide them- around. If you have an injury that goes all the way .to the bone the skin is adherent to the bone. He was found to have low-grade conjunctivitis , which is an inflammation of the mucous membrane of the left eye, and which a prescription for sodium sulfacetamide ointment and solution was prescribed.
“Q. Doctor, from your examination of Mr. Bonnette with particular reference to the left eye, are you in a position to- state what caused the conjunctivitis which you found on your examination? A. No, that conjunctivitis is -something that we frequently see with or without an injury. It wasn’t directly caused by the injury, the injury was to his eyebrow and the conjunctivitis was in the mucous membrane of the eye.
*351 “Q. Doctor,- assuming that Mr. Bóñ-nette received an injury above the eye that required suturing at the -places where you indicated you found scar tissue to exist would it have been pos-' sible in your opinion - for -the injury which caused the scars to have ' also caused the conjunctivitis? A. No, the only way that they could have caused the conjunctivitis would have been to have cut the supra orbital' nerve in which case he would have some sensory paralysis, that is absence of sensation which he doesn’t have and he would get so-called, trophic changes in the conjunctiva of which there are no signs.
- “Q. Doctor, you also examined Mr. Bonnette today, December 1,1952? A. Yes.
“Q. Was there anything that you found in your examination today to change your conclusion with respect to the fact that the conjunctivitis was not caused by trauma? A. No, I don’t see anything to justify changing that impression.
“Q.- What was the result of your examination today, Doctor, as to the condition of Mr. Bonnette’s left eye. What did you find today? A. The skin of the lids is irritated and he has some-mucous pus rather thick in , the-lower conjunctiva sac which is just under the lower lid and also in the outer corner of the eye. He also has an irritated pingueculum which'is due to the conjunctivitis, I mean the irritation is due to the conjunctivitis.- That’s just this little red spot on the outer portion of the white of the eye. He also more or less persisted in keeping his eye closed and voluntarily closed, like that (indicating).
“Q. You say voluntarily. A. That was my impression that it was. The Voluntary signs of. trouble were out of all proportion to the involuntary ones. Where you have an1 irritated eye, sensitive to light the eye-waters. It is a watery eye. This eye is not a watery eye.' It has thick mucous in it instead of it being -a thin, watery discharge it is a thick discharge, where you get pent up secretions instead of free drainage of a thin watery secretion.
“Q. Did you find on your examination today substantially the same condition which you found upon your examination of April 16th? A. I- don’t remember bis lids April 16th. Let me see if I made a notation. I don’t have any notation on his eye lids at that time about him squinting the eye and I don’t remember but I would swear that he didn’t have it; I feel sure I would have made a notation if he did, but I have no notation of it and no recollection of it either;
“Q. . Your examination today revealed that, he still has some conjunctivitis? A. Yes.
“Q. And that was the basic condition which you found at the time of-your examination on April 16th? A. That plus the' forty-nine years of age.
. “Q. Doctor, from your experience as' a specialist,- dealing in injuries and' diseases to the eye, what in your opinion is the cause of the condition which Mr. Bonnette exhibited on the two. occasions that you examined him ? A. Well, I just think, he is not going to get well until he -gets some compensation.
******
“Q. Doctor, assuming — first of all let me ask you this. Did you find that on either of your .examinations that. -Mr. Bonnette had any injury to the lacrimal gland? A. Nol
“Q. Did -your examination consist of the type of an- examination that if such an injury were present you would have discovered it? A. Well, the lacrimal gland is very hard to examine itself and an injury to the lacrimal gland is something — it is just a rare bird. I don’t know that I have ever seen one, .1 don’t recall ever having seen one, I may have but I don’t recall *352 it. The lacrimal gland is situated under the rim of the orbit, the outer corner of the eye and in order for the lacrimal gland to have been injured he would have had to have had a fracture of the rim of the orbit.
“Q. Would that have been something that could have been easily diagnosed by you on your examination if he had such a fracture? A. Oh, yes, you would find that, you would still probably find evidence of it and you could feel it.
“Q. And you found no such evidence? A. No.
“Q. Doctor, in connection with the - examinations that you made of Mr. Bonnette — (interrupted) A. Let me qualify that injury to the lacrimal gland — say an injury to the lacrimal gland is very rare in the absence of a fracture.
“Q. Doctor, were you able to determine form your examination whether was any injury to the fifth and seventh cranial nerves? A. Well, let’s see now, that is facial nerve, the fifth nerve — the supra orbital branch emerges from the rim of the orbit between the two scars. The facial — the seventh nerve, no, if you just want to get a blunt yes or no, no I didn’t find any evidence of it.
“Q. In your opinion then from your examinations of Mr. Bonnette you did not feel that he had received any injury or damage to the fifth and seventh cranial nerves, is that correct? A. No, I don’t think he received any damage to them, on the other hand, he did receive damage to certain fibers which would eventually become part of the fifth and seventh cranial nerves, but that is true in any injury that you have anywhere, you injure parts of nervés— or nerve fibers that will eventually become part of larger nerves such as the fifth and seventh cranial nerves.
“Q. Assuming that his injury did or will cause some injury to the fifth and seventh cranial nerves, will such-injury be .productive of the condition which you . found, the conjunctivitis condition which you found on your examination in April- and again your examination as of today. A. I don’t see how it could have. I have never seen it occur previously and I don’t see how it could have done it.”
Dr. Simmonds testified that plaintiff’s present condition was disabling but his testimony is conclusive that he did not connect plaintiff’s condition in the left eye with the accident of November 23, 1951. He completely refuted the possibility of any injury to the branches of the fifth and seventh cranial nerves having any effect upon the lacrimal gland. In other words, he destroyed Dr. Fendler’s theory of the possibility of such an injury being the cause of plaintiff’s condition.
The medical testimony not only preponderates in favor of the defendant but the only definite medical testimony is positive that there is no connection between the accident, injury and alleged condition of plaintiff’s left eye as against conjectural testimony, that is based upon “it is possible” or “it might be possible.”
As to the lay testimony, it is not sufficient to overcome the positive medical testimony to the contrary. Plaintiff and some lay witnesses testified that he was unable to do the work of a carpenter as he was afraid to climb and could not see clearly as a result of the condition of his eye to properly perform the duties of a.carpenter;
It is interesting to note that two doctors prescribed medicine for the plaintiff and yet there is a total absence of any testimony by the plaintiff with regard to whether he filled these prescriptions and used them or not. In this connection Dr. Simmonds very positively stated that plaintiff’s condition would respond generally to treatment “but you have got to have a cooperative patient, he has got to quit rubbing his eye, quit squinting his eye, and he has got to use *353 some medicine in the eye. Without cooperation it never will get well.”
The judgment of the District Court is reversed and plaintiff’s suit dismissed at his costs.